ELIZABETH K. KUNZ et al.

*v.*

JAMES H. MASON et al.

[Submitted May 5th, 1909. Decided June 14th, 1909.]

1. In a suit to reform a contract for the sale of real estate by reducing the consideration from $65,000 to $55,000 for alleged mistake, complainant's self-serving declaration to others, after the contract was made, and before any controversy arose, that she paid only $55,000 for the property, was inadmissible.

2. An agent of an owner of real estate, authorized to sell the same for a specified price, may not lawfully, after obtaining a purchaser at a higher price, take title in his own name, or in the name of another, using the purchaser's money to complete the purchase, and appropriate the difference to his own use.

3. Evidence *held* to show that defendant had purchased the property in controversy from a trust company for $55,000 before he knew that complainant desired to purchase the same, and that in selling the property to complainant for $65,000 he acted for his own benefit, and not fraudulently or as agent of the trust company.

4. Evidence *held* to show laches on the part of complainant.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Leaming, whose oral opinion is as follows:

I am not inclined to take this case under advisement. It is chiefly a question of fact. The testimony will never be more fully impressed on my memory than it is now at the close of the trial.

The agreement which complainants seek to reform is a remarkable one. In it the defendant Mr. Mason agreed to convey to the complainants a property which, according to one side, was to be conveyed for $65,000, and, according to the other side, was agreed to be conveyed for $55,000, and the purchaser admittedly had but $1,000 to pay in cash on account of the purchase price, and the agreement itself contemplated only a payment of $500 as

the second installment four months from the date of the agreement, and the property was a large hotel, already furnished, of which the purchaser was to take immediate possession and begin business. The agreement, under the conditions which are shown, clearly contemplated that the purchaser should make out of .the business the money which was to enable her to pay the purchase price and the fixed charges in connection with the hotel, consisting of interest on the mortgages, taxes, water rents, insurance, &c. To that end the payments named in the agreement are arranged to fall due during the summer seasons and at no other time. I say this is a remarkable agreement, because I think it is probably the first instance I have observed where a property of so much value has been conveyed for so little cash down. The agreement is peculiar in another aspect, and that is the manner in which its terms are stated. At first I was very uncertain as to the meaning of the agreement; but a more careful reading satisfies me that there can be no doubt as to that. To my mind it clearly contemplates that the purchaser shall pay all of the fixed charges, such as taxes, water rents, interest on the mortgages, insurance, and whatever other items there are of that nature, and that during the first year she shall pay an aggregate amount of at least $8,000, and that whatever portion of the $8,000 so paid is above the expenditures necessary for the fixed charges shall be credited on the purchase price. During the second year she shall pay at least $10,500, and in making that expenditure she shall apply it first to the fixed charges already referred to, and the balance of that amount shall be credited, at the times named, on the purchase price; and during the years succeeding the second year the same course shall be pursued. Assuming that the fixed charges were believed by the parties at the time to be about that indicated by the pencil memorandum, it is apparent that they contemplated that it would take about four years to discharge the agreement, assuming $20,000 or $21,000 to have been the amount of cash to have been paid in the aggregate.

It is contended on the part of the complainants that they are entitled to the reformation of the agreement because of the fact that the real bargain that was made was that the amount of cash

to be paid should be $10,000, instead of the amount named in the agreement. In other words, that the purchase price of the property was $55,000, instead of $65,000; $28,000 of that amount being represented by a first mortgage already existing on the property, $16,000 being represented by the amount due on the second or $17,000 mortgage already existing on the property, and the balance up to $55,000 making the amount of cash to be paid.

So far as complainant Mrs. Kunz is concerned, I am entirely satisfied that her testimony upon the witness stand to the effect that, when she signed this agreement, she believed the purchase price of the property was $55,000, is true. I am not able, after listening to her testimony, to believe that she was willfully falsifying any statement which she has made. She impressed me as a truthful woman and a woman who was testifying to what she believed to be the truth, and under the evidence that exists I can readily conceive that she probably did believe when that agreement was executed that she was getting that property for $55,-000. Whether she believed it at that time or not, she certainly is sincere in her statement to that effect at this time, and I am prepared to treat it as a fact that she now believes that, and that she in all human probability then believed that she was obligating herself for the payment only of the amount of $55,000. There are so many circumstances which lead me to think that that was her belief at that time that I am practically compelled to accept it. The fact that she is a woman who cannot read and write, and was dependent on her impressions as she gathered them from what she heard, rather than what she read, alone goes far toward leading me to believe that the facts probably are that she thought she was buying a property at $55,000. The pencil memoranda also go far to corroborate her statements. I can reach that conclusion very readily without having to resort to the testimony which I think is not competent evidence, namely, the testimony which was offered to the effect that she has stated to others at a time prior to the time that any controversy arose that she had paid $55,000 only for the property.

It is undoubtedly true, however, that no mistake upon the part of Mrs. Kunz touching the contents of the written agreement

which she executed can entitle her to a reformation unless the mistake was a mutual mistake; that is to say, if the reformation is to be had upon the ground of mistake only, it must have been a mistake that was mutual between her and Mr. Mason, and counsel for complainant has stated that he does not now contend that the evidence supports a finding that there was a mutual mistake between the complainants and the defendants as to the consideration of the agreement in question. In other words, Mr. Mason knew that the agreement provided for $65,000, and he did not execute an agreement which he believed called for $55,000 only. That fact alone denies the relief of reformation upon the ground of mistake.

It is contended, however, and with a great deal of force, that the facts of the case, as they must be ascertained by the evidence before the court, disclose fraudulent conduct upon the part of Mr. Mason, or, if not fraudulent conduct, then they disclose conduct upon his part in which he abused the confidence which the complainants were entitled to bestow in him, and abused that confidence in such a manner that complainants are entitled to the equitable relief now sought.

I entertain the view of the law, suggested by counsel, that if the fact is found to be that Mr. Mason was an agent of the trust company for the sale of this property, which at that time belonged to the trust company, and that agency authorized him to sell the property for $55,000, and he, under the circumstances which existed, with the property in his hands for sale at that amount, ascertained that complainants were willing to pay $65,000, and took their money and went down to the trust company and made the purchase in his own name, or in the name of his son-in-law in his own behalf, using the money of complainants to complete that purchase, that his conduct would be of such a nature that complainants would be entitled to be relieved to the extent of the added amount; they would be entitled to be relieved from the excess $10,000, which is now in dispute. I think that would be an equitable disposition of the case if the evidence justifies the finding of the facts stated.

I cannot believe, however, that any person could listen to the

testimony of Mr. Mason upon the witness stand and believe that the transaction was of that nature. I do not think that anyone could listen to the testimony of Mr. Mason and believe that he willfully misrepresented any fact, nor do I believe that anyone could listen to his testimony and help but believe that he was telling not only what he believed to be true, but also telling the literal truth, when he said he bought the property before he knew or had any dealing with the complainants in this case, and before he knew that the complainants in this case were prospective purchasers of the property. I believe Mr. Mason's testimony when he says that he bought this property for speculation, without a prospective purchaser in sight or in contemplation, and bought it with the idea that, should he fail to find a purchaser, some members of his family to whom he referred could operate the hotel to advantage, and that eventually he would make a good thing out of it. I am satisfied that he states the truth when he says that a considerable time prior to his knowledge of the existence of complainants he had made the proposition to the bank and had agreed to pay them $55,000 for the property and considered the transaction closed. These statements on the part of Mr. Mason, I say, I am forced to believe. In corroboration of Mr. Mason's statements, the former agent of the property, an associate of Mr. Mason, was very positive in his statements. His testimony, as far as it goes, fully corroborates Mr. Mason's statements. He says that Mr. Mason did not know, and had no means of knowing, that he was handling this property for the trust company, and did not know through him, at least, that complainants were contemplating the purchase of this property at any time until he introduced the subject, and at that time Mr. Mason had made the purchase. The testimony of the clerk of Mr. Mason is corroborative, so far as it goes, but does not carry, as I view it, very much weight. His testimony is along the line which we would anticipate from a clerk in the office engaged in routine work; but at the same time it is corroborative of the other testimony.

I am obliged therefore to find the fact to be that Mr. Mason, at the time he first came in contact with or knew of the complainants, was not and had not been an agent of the trust com-

pany for the sale of this property, and that he was not guilty of any fraudulent or inequitable imposition upon the complainants in making a sale of this property to them, and that at the time he first met them he regarded himself as the owner of this property. While he was not in law the owner of the property, and, perhaps, had no papers which would have entitled him to enforce specific performance of the agreement of sale upon the part of the trust company, yet he regarded himself as the owner at that time, and in treating with the complainants, in my judgment, treated with them honestly and fairly, and owing to the very peculiar conditions which arose, and which had theretofore existed, Mrs. Kunz very naturally may have made a mistake touching the amount she was agreeing to pay for the property. If the fact be that Mr. Gampher telephoned exclusively to Mr. Kunz, then Mrs. Kunz may not have become acquainted with the fact that the price was to be raised, although she was acquainted with the fact that the terms had been made extremely easy.

The second branch of the case is, I think, equally conclusive in its character. This agreement was made in 1902, and was an agreement in writing containing upon its face the amount of the purchase price of the property, and we are asked six years later, for the first time, to reform the agreement. It is undoubtedly true that such delay may be excused; but I cannot think it can be said to be excused in this case. During the period between 1902 and 1904 the complainant Mrs. Kunz did not know, as she claims, that the agreement called for $65,000 instead of $55,000; but that discovery was made in 1904, and it was then her duty to act. What she did was to acquaint her husband with the fact and to ask him to see Mr. Mason, and thereafter she never ascertained whether he had seen Mr. Mason or not, notwithstanding the fact that she says she was worried about it until she was made sick over it. In failing to take some step, or to see that some steps were effectively taken, to procure a correction of the mistake or fraud which she at that time ascertained to exist from her standpoint, I think she has denied to herself the right to equitable relief two years later, at a time when the agreement is being enforced against her. Since the time she discovered the

mistake in the agreement she has been enjoying the occupancy of the property. Mr. Mason has been continuing to advance money to meet the payments called for by the terms of the agreement, and yet during that period of two years she has not been sufficiently vigilant to even ascertain whether or not the alleged mistake has been brought to the attention of Mr. Mason. I think such conditions must be held to operate as a bar to equitable relief sought at so late a date. My conclusion will be that complainant is not entitled to relief from any portion of the expressed consideration as it appears on the face of the agreement.

Under the stipulation which counsel have made, if it is still sought to have an account taken of the amount due, a reference will be made to a person to be agreed upon to have the account stated. Have counsel made any effort to agree upon a person?

Mr. Cole and Mr. Garrison: We will agree upon Mr. Bourgeois.

The Vice-Chancellor: Let the reference be made to Mr. George A. Bourgeois, as special master. I deny the relief prayed for in the bill so far as it is based upon the averment that the consideration was $55,000 instead of $65,000. I adjudicate nothing touching the amount due. That is to be ascertained.

Mr. Clevenger: A decree will be for the specific performance of the $65,000 contract and the order of reference to Mr. Bourgeois to state the account.

Mr. Garrison: I won't agree to an accounting unless we can get this back this term. If they cannot do that, I do not want to agree to it. I think Mr. Bourgeois, if you will explain the situation to him, will probably do this by next Monday.

The Vice-Chancellor: You may prepare your order in which it is ascertained that the agreement will not be reformed, and that the matter will be referred to Mr. Bourgeois, as a special master, to report at the earliest possible date as to the amount due under the agreement.

*Messrs. Wilson, Carr & Stackhouse,* for the appellants.

*Messrs. Garrison & Voorhees,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion of Vice-Chancellor Leaming, delivered in the court below.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, GRAY, DILL, CONGDON—15.

*For reversal*—None.